Good morning. Robert Hulting on behalf of M&M Automotive, the employer. You're right, Your Honor, a little bit of an anomalous situation. I am dividing time with counsel for the union, which is unusual. And I think we've decided to take ten minutes each. I'd like to reserve two minutes of my time for rebuttal if I could. You certainly may. Just watch the clock. I will do so. Your Honor, to the Court, the issue in this case is actually sort of a routine one when you look at how employers operate. This is a situation where an employer, in the course of bargaining, gave some increases to some employees, the kind of thing that every company does as a matter of course. In this case, these employees got promotions. And with those promotions, they got increases in pay. You didn't tell the union what you were doing when you were in the course of bargaining and negotiation, right? This employer did not. In fact, Your Honor, I believe this employer, like most employers, assumed this is just sort of a normal thing. We're giving promotions, we're giving increases, and certainly the union would not have a problem with increases. And I'm not saying that this employer would not have a problem with increases, but I'm not saying that this employer would not have a problem with increases. I'm saying that this employer would not have a problem with increases. When you read the record, as I understand it, there was at least one employee that told somebody that was on the bargaining committee and we don't know whether it went any further than that, but apparently it didn't. Is that right? Yeah. Mr. O'Neill apparently told Mr. Finnerty, who was the shop steward and a member of the bargaining committee, about the increase that was given to him. But we don't know whether there was any full discussion in bargaining about the matter. About that particular increase, no. Or any of them. Well, Mr. Arcos's increase clearly was discussed at the bargaining table, not the actual increase he got, but whether or not he should get an increase when he moved into a new position. So the topic was definitely in play at the table. You don't quarrel with the findings that the union was not aware of, that the NLRB made that the union was not aware of the increases and the reclassification of employees? We do not quarrel with the finding that there was not an actual notice given by the employer to the union. We certainly agree with the administrative law judge that under the facts of this case, the union had constructive knowledge, and if not constructive knowledge, certainly did not exercise due diligence. ALJ opinion is not here. What we're dealing with is what the NLRB did. I agree, Your Honor. And I take it counsel for the government is going to represent the NLRB, although he may have argued something different to the NLRB because he was supporting the ALJ. But that's the way labor law comes. It is the way it comes. But, again, I think the case law indicates clearly that one has to look at the record as a whole, substantial evidence based on the record as a whole, and the ALJ made some very specific findings here, findings of fact with respect to constructive notice. And so did the board. And we believe in that respect the board erred, Your Honor. The evidence was clear in this case. You want me to reevaluate the evidence and decide which one of the two is correct? We believe that the court's obligation is to look and make sure. It's inconsistent. The board's obligation is to make sure that the board's decision is supported by substantial evidence on the record as a whole. And why isn't it? It is not because the board chose to ignore the findings of the administrative law judge, very specific findings. That word always sets me off. The board didn't ignore them at all. The board was fully aware of them. Discard. The board disagreed. I mean, ignore would be a better word. Okay. The board chose to discard the findings of the administrative law judge. The board examined the findings and came to a different conclusion. And there was no basis for that conclusion, Your Honor, because if you look at what the administrative law judge did here, he analyzed these facts closely and he made specific findings that the union in this situation, a very small unit, wages were discussed regularly in lunch meetings and other meetings. They were discussed at the table. I just went through the facts with you as I understood them, and you agreed with me that there was no direct communication to the union by the employer of either pay raises or reclassification. I agreed that the employer did not give specific notice to the union. On that basis, the NLRB could make a finding that it didn't happen, right? I disagree, Your Honor, because the labor board has to look not just at actual notice, but also constructive notice and the due diligence argument. All of them are present in the board cases and all need to be looked at. Was Finnerty a union official? Finnerty was a member of the bargaining committee. Was Finnerty a union official? He was an agent of the union for purposes of this. Was Finnerty a union official? He was not an official, Your Honor. That's the point I'm getting at. He was shop steward. He was there at 11 of the 12 bargaining sessions. You're hanging your hat partially on Finnerty. Isn't that correct? We do. Did Finnerty ever turn around and tell anybody in the union, as far as you can tell, what was going on? Well, we don't know because Mr. Finnerty was not called as a witness. And that baffles me. Why is Finnerty not called by a witness as somebody? I mean, he seems to be the key player in the case, and nobody wants him anywhere near the fact-finding process. Which we believe supported the judge's conclusion that an adverse inference must be drawn in these circumstances. Were you prohibited from calling Finnerty as a witness, your side? Neither side was prohibited, but certainly Mr. Finnerty's interests were aligned with the union in this case, clearly. The union had the obligation if it wished to dispel the notion that Mr. Finnerty had notice and was aware. Again, these changes, Your Honor, these promotions, this is a small bargaining unit. These promotions were obvious promotions. These people moved into new positions. They were doing new jobs. Now you're arguing facts to us. You know, they were obvious. It's not for us to conclude that they were obvious. I mean, we're looking at whether there was substantial evidence supporting the Board's final decision. Absolutely, Your Honor. And the substantial evidence, in my view, is not there because of the facts that I am pointing out, the facts that the Board did not give sufficient consideration to and, indeed, chose to reject. And specifically, the small shop here, the fact that Mr. Finnerty clearly was aware he was working in that shop. He knew that these people had received promotions. That was open and obvious, as the administrative law judge concluded. It was open and obvious. Moreover, the union representative was there regularly having lunch with these guys, talking about the wage issues. That's all undisputed. If this union did not know about the promotions and raises, they did not exercise due diligence, as found by the administrative law judge. Those are the issues the Board didn't address, the due diligence issue and the constructive notice issues. So in that respect, I think the Board erred. The Board kind of buries the whole Finnerty and the Espinal issues in footnotes, which is sort of interesting. They do, and they really do not. At one point, the Board does acknowledge, though, we take for we will assume for purposes of argument Mr. Finnerty was a representative of the union for purposes of this proceeding. They do make that finding. Assumption. Assumption. The one other issue, and I'm very short on time here, that I think is critical is the causation issue here. I do believe the Board's decision is very weak there, where the Board concludes that somehow these unfair labor practices caused disaffection from the union. These were simply raises attached to promotions. These events were very close in time, were they not, with the withdrawal of recognition? It depends on your definition of close. Some were eight, ten months in advance of the withdrawal of recognition. The last one was about a month before. They were over the course of a year. But the causation issue I think is a critical one here because I don't think that causal link has been found by the Board. These were routine increases, promotions, things that every employer does. Would these have caused employees to decide they don't want the union? They got these increases because they got promotions. And in no way would that cause them to think, gee, the union is somehow ineffective. Well, what did cause people then to decide they didn't want the union? My belief, based on the record, is the union bargained for a year and wasn't able to achieve a contract, didn't act all that diligently. The last couple months there weren't even any meetings. They took the holidays off. Nothing was happening. That's clearly the reason. Obviously, I'm conjecturing on that, but I believe that to be the reason. I should reserve my remaining time. Thank you, Your Honor. Thank you, Mr. Counsel. I mean, David Rosenfeld, on behalf of the union involved in this, which actually consists of several unions, our only point is, like you, we're a little bit unhappy that the Board buried our issues in footnotes, which the Board has a habit of doing in cases. And this Court has noted about that in other cases. Our issue rests upon Mr. O'Neill, who got a wage increase, and the Board, in a footnote, doesn't resolve the issue whether that wage increase was unlawful. Mr. Espinal got a wage increase. The Board doesn't resolve the question whether that wage increase was unlawful. And then as part of the promotions, five folks got their job classifications and duties changed, and the Board doesn't deal with that in a footnote. Counsel, I thought you essentially prevailed in this case. What why is it significant to you that the Board make formal determinations on these remaining issues? Well, I'll take the two adverbs as you use them. Yes, we essentially prevailed. All right. And yes, I'm not going to argue to this Court that it's very significant or really significant, but it is an issue, because if we're correct here, you've got two additional wage increases which were unlawful that we can't. Wait a minute. You've got relief from the Board that says, in essence, if you want to walk in tomorrow and repeal all of those wage increases, you have the authority to do it, right? It's not clear, because the Board's orders say. I read the order. If you read the order that way, I'm satisfied, because I we read it differently. That's the way I read it, too. Absolutely bizarre, because you have a terrible hammer over negotiations now. Well, you're. Well, beyond. You reduce all these people to 19, what is it, 1996 pay or 19. You take them way back to a salary level that was in existence five years or six years ago. Well, it's not clear we're going to do that, and it may be. No. But it's your election. At what standard are you going to exercise that option? Well, what the union has to do when it gets back to the bargain table is look at the status of everyone's wages and see if people are out of line. I mean, this is sort of the old schoolhouse problem of the teacher's pet. And if when we look at all the wages as they are at the time we sit down at the table and somebody is out of line with more than what's fair to everyone else, we may say rescind it. But we can't make that judgment until we've got all that information, which is why the Board order doesn't say automatically rescind. It says it's the union's option. But is there something which would prevent you from doing that in this order? Is there? It's just silent maybe. Is that what you're saying? It's not quite silent. Here's my – here's the reason. The Board's order says, and this is in Excerpt 261, if the union requests, cancel the wage increases and rescind the promotions unlawfully granted. You can use that as a terrible hammer to further negotiate a negotiation status. Well, not really, because we're sensitive. Wait a minute. You're going to have six very unhappy employees that can't put food on the table if you exercise the option. That's your problem. You don't want to do that. Normal unions don't do that. That's right. It's unusual. You want somebody else to do it for you. No, no, no, no. No, absolutely not. No. We just want to be able to sit down at the bargaining table and say, what are you currently paying everybody? Let's compare people. And if somebody is more than somebody fairly put, then we'd say, look, that person is getting more. Why don't you either increase the others or potentially reduce that person because he's way out or she's way out of line? And the board's order said unlawfully granted. And I read that to mean we could only ask for rescission of those wage increases which the board has specifically found unlawful. And having declined to find Espinal and O'Neill's increases unlawful, we might face some resistance on that. That's the reason for the Petitioner for Review, because of that word unlawful. Did you have the capacity to go into the board and ask for clarification on that point? You did. And did you? No. Why not? Because. Why come all the way up here when the first line of search for a remedy would have been with the board? Hey, board, guess what? You know, look what you did. We're not sure what this means. Well, because there is what's called a tiny argument. The board could have argued to this court that we didn't raise that issue before the board, but we effectively raised the issue because we took the position that those wage increases were unlawful and they declined to find them unlawful. So Your Honor's plural question to me is the remedy issue as opposed to the liability issue. The board declined. You certainly never conceded they were lawful, and I don't think you're conceding they're lawful now. No, we're not. That was the reason for this Petitioner for Review, because it wasn't clear that we could do that. Not to say we want to. If it's in the plural, it's not just the last case that they're giving you relief on. They're giving you relief on all the cases. Well, all I can say is they were unlawfully appeared there, and the board specifically declined to find them unlawful, and that was the reason we challenged the board's failure. I would agree, had the board found them unlawful, it would have been cumulative. We would never have filed the Petitioner for Review. I have nothing else to add to this other than that. Thank you, counsel. We'll hear from the board. May it please the Court, my name is David Fleischer, representing the National Labor Relations Board. Now, the company, in its brief, has not suggested that the unilateral changes, even though it here suggests there was nothing unusual about the pay raises and promotions, it did not argue in its brief and therefore can't argue now that if charges were timely filed, the changes would nevertheless be lawful. So the issue in the case is, were the charges timely filed? And our answer is yes, because as to, at least as to the violations the board found, leaving aside O'Neill's wage increase, which they didn't decide, there was no showing of either actual or constructive notice to the union until January of 99, which was well within the permissible 10B period. Counsel, let me ask you a question. Clearly, the order requires that they enter into collective bargaining again. Is that right? That's correct. How long does that have to go on before you can ask for a board election of decertification? Well, it's a reasonable time, and the board held in Lee-Lumber that a reasonable time would be somewhere between six months and a year. So if the union exercised the rights they have under the order to require pay reductions and classification changes, that clearly might trigger a request for decertification by the employees. And if they went to the board and said, we want a board-conducted election when that happened, would it happen? Well, not right away. It would happen at the end of the reasonable time, as I have stated. They're going to reach an impasse with a small unit like this. You know, if the employer gets his foot in the mud and keeps it there, it's not going to move very far. They wait 10 years. Well, the reality is that once the reasonable time has expired, if the union has forced the employer to cut back the wages of a sizable portion of the bargaining unit, they will seek decertification. And therefore, as a practical matter, we don't think the union, which is well aware of the possibility of decertification, is going to do that. Is it hollow relief that the board granted then? It seems to me they gave the union a lot of leverage. Well, it's paper leverage in practice. This kind of unilateral change is not something that the union has a lot of leverage on simply because of the threat of decertification down the road. There are other kinds of unilateral changes where the union would have more leverage. Okay. And anyway, now it's clear under- Six months minimum, and then they can seek an election. Yes. Yes. Now, reasonable time as to whether it's six months or a year depends on a number of factors, which we would have to see when the time came. But I'm assuming that the employers- Should the board be more specific so the parties know exactly where they stand? A reasonable standard is recognized in the law. I agree. We have reasonable women cases all the time and so on. But in this negotiation, there's some precise things that have to happen, and it seems to me that the order is a little vague on when that process comes to a possible termination, if the employees rise up and ask for it. Well, the length of the reasonable time depends in part on what happens during negotiations, including one factor is whether a good faith impasse is reached. And, of course, we can't predict the course of future negotiations. You're not able to predict based on what's already happened. Well- Twelve sessions in a small shop and you can't arrive at an agreement is pretty bad. Well, of course, one of the reasons they couldn't arrive at an agreement may well have been the unilateral changes. And since causation is a proper issue in this case, I would mention the very fact that no employee got a pay raise through bargaining during these twelve sessions. And here you have five employees getting a pay raise through unlawfully unilateral action by the employer. The message is pretty clear to employees that the best way to get an increase is to get rid of the union. And the most graphic example of that is employee Arcos, who's one of the five. And in his case, the union specifically requested a raise during negotiations, and the employer wouldn't agree at the table that an increase, but then it gave him one on its own. So he knew who was buttering his bread, certainly. On the issue of notice, the law is quite plain that it's the burden of the employer to show such notice. And although it makes a number of arguments as to why there was notice, the problem with all of them is that they're not supported by any evidence, even in the case of O'Neill, although they did get him to testify that he told Finnerty about his wage increase. Their questions, the company counsel, which was not Mr. Holtang, asked him at the hearing, were quite pointedly limited to the wage increase. They never, for whatever reason, they never asked him about the promotion or the change in job classification, and they're stuck with the record that they made. As to the unions being in the shop and talking to employees, the union, the only time the union was ever allowed in the shop was on the days that bargaining sessions took place, which were roughly on the average of once a month. And even then, they couldn't wander around the shop during working hours to see what work the various employees were performing. And if it had changed, the only thing they could do was meet with the employees over lunch break. And there is no showing that any employee mentioned to them anything about wage increases or promotions. It's not even clear that the employees who received these benefits were among the ones who were present at these lunchtime meetings. This, too, is a gap in the record that it was up to the company, not the general counsel or the union, to fill. The question of whether Mr. Finnerty incidentally, excuse me, I'll come back to that in a second, in contrast to how often the union was at the facility. One might mention that Murphy, the company co-owner and later president, was by his own testimony at the facility about twice a week, and even he didn't know about most of the pay raises or promotions until the union filed its charge. So if he didn't know, it's hardly surprising that the union didn't. Counsel, let me ask you about a position expressed by Mr. Rosenfeld, who preferred that the board resolve some of these other issues. What's the board's response on that? Well, the board's response is that there is no showing that it would meaningfully affect the remedy. I mean, the union would like to be able, I guess, to have the theoretical right to ask for rescission of wage increases for two more people, one of whom is no longer with the company, so it's basically academic as to him and as to the other. The practical point that I made is as much applicable to him as to the other four. As for its effect on a bargaining order, if violations as to five out of 16 union employees isn't enough to warrant an affirmative bargaining order, I doubt that violations as to one more employee would carry the day for us. One other question, which doesn't deal with an issue in the case, but it just struck me that the timeline here is quite remarkable. These events really go back to 1998, and the withdrawal of recognition by the employer occurred in May of 1999. The ALJ apparently decided in April of 2000, and here we are in October of 2006. That whole process is about seven years long. Is this fairly typical of the board these days? Well, it's very unfortunate, and I must admit the board took four years to decide the case, and that's not something we can be proud of. That's putting it mildly, not something you can be proud of. It's disgraceful. Four years? Well, I... Even the Ninth Circuit doesn't take four years. We're getting there. We're getting there. I mean, life suspends while nothing goes on. Well, it's certainly very unfortunate, but we would submit it's not a basis for a different result as to any aspect of this case. But it has a lot to do with the repeal of those pay raises four years ago. Well, I don't know whether there have been any more pay raises since this record doesn't say anything on that score. But the other thing that the company also says, well, it was incumbent on the union to produce Mr. Finner, to testify as to whether he knew about anything beyond O'Neill's wage increase. The law is quite the other way around. It was the general counsel did, in fact, produce the union's lead negotiator, Mr. Cruzado, who was at every bargaining session to testify. Was Cruzado asked if Finnerty told him anything about funny stuff going on behind the scenes? He was asked whether anyone, including specifically Finnerty, told him about any of these actions. And his response was nobody, and specifically not Finnerty, told him anything until January 1999, which is within the 10-B period. And that's part of my problem with the ALJ's conclusion that Finnerty did inform the union of O'Neill's promotion of the alleged direct dealing. And that's a large leap of faith given Cruzado's testimony. Well, the ALJ drew adverse inferences against the general counsel, and wrongly so because of where the burden of proof is. And since the general counsel did actually produce Cruzado to testify what I just said, and since Cruzado was found to be a credible witness, it was up to the company to produce some sort of testimony that would rebut Cruzado, and it didn't. And it can't use the adverse inference rule in place of such testimony. And as far as the board's reversal of the ALJ, I would stress, this is not a case like Penosquito's where they reversed credibility resolutions. That may require extra justification. In this case, the only credibility resolutions the ALJ actually made were to find two people credible, Cruzado and Murphy. Cruzado's testimony clearly supports the board's conclusions, and there is nothing in Murphy's credited testimony that's contrary to them. So this is one of those cases where the fact that the ALJ reached one conclusion and the board the opposite conclusion does not call the board's conclusion into serious question. If there are no further questions, I will simply say that we submit the board's order should be enforced as it stands without any remand for the purposes suggested by the union. Thank you, Mr. Fleishman. Counsel has plenty of reserved time, so you may proceed. Mr. Hulting. I have to thank Mr. Rosenfeld for reserving some of that time for me, I suppose. First of all, I want to focus on two issues, and let me turn to the remedy first, the affirmative bargaining order here. I think Your Honor mentioned the five-year passage of time, four-and-a-half-year passage of time between the ALJ's decision and the board's decision. The actual withdrawal of recognition here was February of 1999. The case is cited by the board in support of their argument that there should be an affirmative bargaining order, that being the order that would require bargaining for a reasonable period of time, six months to a year. They all involve cases where the board decided the issue within a year, around a year, that kind of time frame. Here we have a situation where the board is saying the employer and these employees should be saddled with a bargaining obligation approximately, by the time it would start, it would be early 2007 at least. That would be, what, eight years after the employer withdrew recognition from the union. Have circumstances changed just to make it ridiculous? Well, Your Honor, I think the mere passage of time alone would, in my view, Not if everything is still the same. Well, but here we have a situation, these employees, at this point in time, we have no indication whatsoever that there would still be support for the union. There's an argument by the board that these unfair practices have a lingering impact. So what do you want us to do? My argument would be that with respect to the affirmative bargaining order, there should be a normal remedial order, which would be cease and desist, but not this added order, which the board has attached here, saying six months to a year, these employees are forced to be represented by a union that perhaps in few weeks Do we have the power to order that or do we have the authority only to remand it to the board for reconsideration under changed circumstances? Your Honor, I believe that the court would have the authority to just indicate that only the remedial portion of the order should be enforced, as opposed to the affirmative bargaining order, which is an add-on, which is an additional component of the order. The problem I have with your argument that the union had constructive notice is in the ALJ's discussion of Finnerty. I mean, he says this inference that he concludes, he draws the inference that Finnerty did inform the union. I mean, that's a pretty big inference, especially when Crisanto said, no, he didn't until a certain date. And isn't the board entitled to take a look at that and say that inference simply is not supported? By the record? Your Honor, I think the ALJ, I think, draws two conclusions in that regard. First of all, he says he does make that leap of faith that Finnerty would have told Crisanto. In the face of Crisanto's credible testimony that he wasn't told? Correct. Number one. And number two, he drew an adverse inference. It's an affirmative defense, 10b. And to draw an adverse inference against the other side of somebody who has an affirmative obligation to come forward and present the defense seems to me to be wrong, too. Well, if you look, Your Honor, I think the judge went one step further, which is he found that even if Crisanto did not know, let's assume we're crediting Crisanto's testimony, the facts of this case indicate he did not exercise due diligence, relying on a series of board cases that in a small shop like this where he's the Crisanto was present regularly in contact with the employees. These were open increases. These were promotions. They were not something hidden or secret, as the board has suggested, that under those circumstances that Crisanto at a minimum failed to exercise due diligence. The last point I'd like to make or the last topic I'd like to quickly address would be this issue of causation. And just for a moment, is Mr. Rosenfeld expecting to have any additional? I'll just reserve a minute. A minute, okay. Let's be sure and reserve a minute for you, Mr. Rosenfeld. All right. I will do so. With respect to the causation issue, the one thing I did want to mention again, or I don't think I mentioned earlier, but when counsel was discussing causation, there was the assertion that these unfair labor practices caused a disaffection from the union. I think that causal link is missing. And to the extent that there was any question about that, I should note that at the hearing, the employer offered to put forward the five individuals who got the wage increases so that there would be testimony as to whether those increases influenced them in any way. The judge refused that. However, the employer made an offer of proof that those individuals would have testified that, in fact, those wage increases had no influence on their opinions regarding the union. So to the extent that there's this assumption that these wage increases caused disaffection from the union, it's focused on these five people, and the employer did offer those people to testify. Thank you, counsel. Thank you, counsel. Your time has expired. Mr. Rosenfeld, you have about a minute. Two points. We argued in our brief that the appropriate process to withdraw recognition is a board-conducted election. This problem wouldn't be before the Court if the board would accept the proposition, which it has stated repeatedly, that the preferred method to determine employee sentiment is a board-conducted election. There would have been, under these circumstances, a board-conducted election if that had been the employer sought it. If a majority of the employees petition the board for an election, is it, per se, granted? You don't even need a majority. You need 30 percent to file it. All right, 30 percent, whatever the figure is. Is it automatic? Only if it's filed without no context of employer and for labor practices. It's automatic unless the employee has done something else. If all the employees get reduced pay, you'll get the petition, I'm sure. So we do want to be clear. I want to be clear. We're not going to go back and ask that. All we're going to do is look at the situation. We may say one person's out of whack, change it. And I just want to respond to this question about changed circumstances. There are bargaining order cases where courts have remanded cases because the employer asserts our business has changed in the meantime. There's no evidence in the record and no assertion of change. I haven't heard that at all. You're right. Okay. Now, you want a board-conducted election. No. Our position is that where employees select a union to a board-conducted election, and the board has repeatedly and currently takes the position that the appropriate way to determine whether employees want the union or don't want the union is to a board-conducted election. The employer is not privileged to withdraw recognition because it says we have a piece of paper. So what are you asking us to do, precisely? We're asking that you find that putting aside the issue of the petition and the withdrawal, that the board could not allow the employee to withdraw recognition in the absence of a board-conducted Section 9 election where the employees could really state their preference in this laboratory condition. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision. The Court will adjourn until 10 o'clock.
judges: Beezer, O'scannlain, Trott